**RECEIVED**

APR 2 3 2019

Law Department

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

Allegheny _____ County

| *For Prothonotary Use Only:* |
| --- |
| Docket No: GD 19-005732 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

**Lead Plaintiff's Name:**
William Kaufman

**Lead Defendant's Name:**
Johnson & Johnson Consumer, Inc., et al.

**Are money damages requested?** [x] Yes [ ] No

Dollar Amount Requested:
(check one)
- [ ] [ ] within arbitration limits
- [ ] [x] outside arbitration limits

**Is this a *Class Action Suit*?** [ ] Yes [ ] No

**Is this an *MDJ Appeal*?** [ ] Yes [x] No

Name of Plaintiff/Appellant's Attorney: Leif J. Ocheltree, Esq.

[ ] **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability *(does not include mass tort)*
- [ ] Slander/Libel/ Defamation
- [ ] Other: _____

**MASS TORT**
- [x] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other: _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other _____

- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other _____

- [ ] Other: _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other: _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other _____

- [ ] Zoning Board
- [ ] Other: _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other: _____

*Updated 1/1/2011*

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

COVER SHEET

| Plaintiff(s)<br>William Kaufman and Irene<br>Harding-Jester, his wife | CIVIL DIVISION |
|---|---|
| | **Case Number :** GD - 19 - 005732 |
| | **Type of pleading :** Complaint in Civil Action |
| | **Code and Classification :** 012 |
| | **Filed on behalf of** Plaintiffs <br><br> (Name of the filing party) |
| **Vs**<br>Defendant(s)<br>Johnson & Johnson Consumer, Inc.;<br>Rite Aid Corporation | ☑ Counsel of Record<br>☐ Individual, If Pro Se |
| | **Name, Address and Telephone Number :**<br>Leif J. Ocheltree, Esq.<br>Goldberg, Persky & White, P.C.<br>11 Stanwix Street, Ste 1800<br>Pittsburgh, PA 15222 |
| | **Attorney's State ID :** _____ |
| | **Attorney's Firm ID :** 744 |

GD-19

[cover]

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CIVIL DIVISION – ASBESTOS

| | |
|---|---|
| WILLIAM KAUFMAN, and<br>IRENE HARDING-JESTER, his wife, | GD No.   19-005732 |
| Plaintiffs, | Code: 012 |
| vs. | **COMPLAINT IN CIVIL ACTION** |
| JOHNSON & JOHNSON CONSUMER, INC.,<br>RITE AID CORPORATION, | JURY TRIAL DEMANDED |
| Defendants. | Filed on behalf of Plaintiff: |
| | Counsel of Record for This Party: |
| | Leif J. Ocheltree, Esquire<br>PA ID No. 163508 |
| | GOLDBERG, PERSKY & WHITE, P.C.<br>11 Stanwix Street, Suite 1800<br>Pittsburgh, PA 15222<br>(412) 471-3980 |
| | Firm #744 |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CIVIL DIVISION – ASBESTOS

WILLIAM KAUFMAN, and
IRENE HARDING-JESTER, his wife,                              GD No.

Plaintiffs,

vs.

JOHNSON & JOHNSON CONSUMER, INC., et al,

    Defendants.



## NOTICE

    You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

<u>IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ON AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.</u>

LAWYER REFERRAL SERVICE
ALLEGHENY COUNTY BAR ASSOCIATION
400 KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
TELEPHONE: (412) 261-0518

2

COMPLAINT IN CIVIL ACTION

1.      The plaintiff, William Kaufman, is an individual residing at 1000 Follies Road in

Dallas, PA 18612.

2.      The plaintiff, Irene Harding-Jester, is an individual residing at 5142 Leiper Street

in Philadelphia, PA 19124.

3.      The defendant, JOHNSON & JOHNSON CONSUMER, INC., is a corporation

incorporated in the state of New Jersey, having its principle place of business in New Brunswick,

New Jersey, and is qualified to do business in the Commonwealth of Pennsylvania

4.      The defendant, RITE AID CORPORATION, is a corporation incorporated in the

state of Delaware, having its principle place of business in Camp Hill, Pennsylvania, and is

qualified to do business in the Commonwealth of Pennsylvania.

5.      Plaintiff William Kaufman used Johnson & Johnson talcum products from his

date of birth on 12/25/1978 through 2018. Plaintiff and his family members frequently purchased

Johnson & Johnson talcum powder products from various stores including, but not limited to,

Rite Aid, in Pennsylvania.

6.      During the period of time set forth hereinabove, Plaintiff was exposed to and did

inhale asbestos dust contained in various Johnson & Johnson talcum powder products, which

caused the conditions as hereinafter set forth, resulting in Plaintiff's impairment.

7.      Plaintiff was diagnosed with mesothelioma on February 19, 2018. Plaintiff was

unaware of and could not discover the nature and cause of said mesothelioma before February

19, 2018.

3

Date served: __4__ / __19__/20 __19__ Product(s): __ASB__
Company(s) served: _____ JJCI _____
Method served: HS  FX  CMD  RM  OTHER _____
Date received by LD: __4__ /__23__/20 __19__ No postmark: _____
Service type: initial  Add'l  Refiled  Amended  Multi #_____
JJL# __2019006438__ Paralegal: __MD__

<u>COUNT I</u>
<u>STRICT PRODUCT LIABILITY</u>

8.     Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

9.     The defendant companies (hereinafter defendant "sellers" and "manufacturers") or their predecessors in interest, at all times relevant, engaged in one or more of the following activities involving asbestos and other ingredients in their materials, including, but not limited to, the manufacturing, distributing, supplying, and/or selling asbestos-containing talcum powder products and other dangerous ingredients and products.

10.    At all times pertinent hereto, the defendants acted through their duly authorized agents, servants and employees, who were then and there acting in the course and scope of their employment and in furtherance of the business of said defendants.

11.    Defendants engaged in distribution, supply, and sale of asbestos-containing Johnson & Johnson talcum powder products to which Plaintiff was exposed.

12.    As a direct and proximate result of the inhalation of the dusts contained in Johnson & Johnson talcum products, Plaintiff contracted the disease set forth herein.

13.    The condition of Plaintiff is a direct and proximate result of the defendants' manufacture, production, distribution, and/or supply and/or sale of products containing asbestos and other dangerous ingredients which were inherently, excessively, and ultra-hazardously dangerous to Plaintiff and/or lacked elements necessary to make them safe for their intended uses, including but not limited to a warning.

14.    Plaintiff's disease as set forth herein with associated complications was directly and proximately caused by the acts of the defendants acting through their agents, servants and

4

employees and the defendants are liable therefore, jointly and severally, to the plaintiff for their breach of duty imposed by Section 402A of the <u>Restatement (Second) of Torts</u>.

15.     As a direct and proximate result of the action of the defendants aforesaid, the inhalation of asbestos fibers from defendants' products, the Plaintiff has suffered severe and serious injuries.  He suffers from mesothelioma, an asbestos-related disease, severe pain and discomfort.

16.     For Plaintiff's injuries sustained as a direct and proximate result of exposure to the defendants' defective products as aforesaid, the Plaintiff demands the following relief:

a.     Compensation for great pain, suffering and inconvenience;

b.     Compensation for Plaintiff's limitation and preclusion from performing normal activities;

c.     Compensation for great emotional distress;

d.     Compensation for Plaintiff's loss of his general health, strength and vitality;

e.     Compensation for medicine, medical care, nursing, hospital and surgical attention, medical appliances and household care;

f.     Punitive and exemplary damages;

g.     Any further relief found just and appropriate by the Court.

WHEREFORE, Plaintiff has been damaged and claims damages of the defendants, jointly and severally, in an amount in the excess of Fifty Thousand ($50,000.00) Dollars, which is in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania.

5

## COUNT II
## NEGLIGENCE

17.     Plaintiffs incorporate the aforementioned paragraphs by reference as though fully set forth herein.

18.     Defendants breached their duty to Plaintiff by exposing him to asbestos dust and fibers when they knew or should have known that exposure to asbestos fibers could result in serious bodily injury, including mesothelioma.

19.     The condition of Plaintiff is a direct and proximate result of the negligence of the defendants, both jointly and severally, in that they produced, supplied, and/or sold, products containing asbestos and other dangerous ingredients, which defendants knew, or in the exercise of reasonable care, should have known, were inherently, excessively, and ultra-hazardously dangerous to Plaintiff.

20.     The defendants mined and/or milled and/or manufactured and/or supplied and/or sold products which they knew were defective and/or unreasonably dangerous to the user or consumer, such as Plaintiff, and acted in such a manner which was willful, wanton, gross and in total disregard for the health and safety of the user or consumer, i.e., Plaintiff.

21.     Defendants, individually, together and/or as a group, have possessed since 1929 medical and scientific data which indicated that asbestos-containing insulation and other materials were hazardous to health.  Prompted by pecuniary motives, the defendants, individually, together and/or as a group, willfully and wantonly ignored and/or failed to act upon said medical and scientific data.  Rather, they conspired together to deceive the public in several aspects: by controlling industry-supported research in a manner inconsistent with the health and safety interest of users and consumers: by successfully tainting reports of medical and scientific data appearing in industry and medical literature; by suppressing the dissemination of certain

6

medical and scientific information relating to the harmful effects of exposure to said products; and by prohibiting the publication of certain scientific and medical articles.  Such conspiratorial activities deprived the users of defendants' products of the opportunity to determine whether or not they would expose themselves to the unreasonably dangerous asbestos products of said defendants.  As a direct and proximate result of the aforesaid actions, Plaintiff was exposed as alleged and contracted the diseases set forth herein.

22.     As a direct and proximate result of the actions of the defendants as aforesaid, and inhalation of asbestos fibers from the defendant's products, the Plaintiff has suffered severe and serious injuries.  He suffers from mesothelioma, an asbestos-related disease, severe pain and discomfort.

23.     As a direct and proximate result of the recklessness, carelessness and negligent conduct of the above named Defendants as aforesaid and the injuries sustained, Plaintiff claims damages as follows:

a.     Compensation for great pain, suffering and inconvenience;

b.     Compensation for Plaintiff's limitation and preclusion from performing normal activities;

c.     Compensation for great emotional distress;

d.     Compensation for Plaintiff's loss of his general health, strength and vitality;

e.     Compensation for medicine, medical care, nursing, hospital and surgical attention, medical appliances and household care;

f.     Punitive and exemplary damages;

g.     Any further relief found just and appropriate by the Court.

WHEREFORE, plaintiff has been damaged and claim damages of the defendants, jointly and severally, in an amount in excess of Fifty Thousand ($50,000.00) Dollars, which is in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania.

## COUNT III
## LOSS OF CONSORTIUM

24.     Plaintiff incorporates the aforementioned paragraphs by reference as though fully set forth herein.

25.     As a direct and proximate result of the carelessness, negligence and recklessness of the defendants and of the aforesaid injuries to her husband, the Plaintiff-wife has been damaged as follows:

      a.  Plaintiff-wife has been and will continue to be deprived of the services, society and companionship of her husband;

      b.  Plaintiff-wife has been required to spend money for medicine, medical care, nursing, hospital and surgical attention, medical appliances and household care for the treatment of her husband;

      c.  Plaintiff-wife has been and will continue to be deprived of the earnings of her husband.

WHEREFORE, wife-plaintiff, IRENE HARDING-JESTER, has been damaged and claims damages of the defendants, jointly and severally, in an amount in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania.

## COUNT IV
## FRAUDULENT MISREPRESENTATION AND CONSPIRACY/CONCERT OF ACTION

26.     Plaintiff incorporates the aforementioned paragraphs by reference as though fully set forth herein.

27.     For decades, Johnson & Johnson mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used

8

and/or otherwise placed in the stream of commerce products composed of talc that were sold and marketed as safe for daily use by consumers on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture.  Johnson & Johnson's products were advertised as healthful for babies, children and adults to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

28.     Johnson & Johnson and the Cosmetic Toiletry and Fragrance Association ("CTFA") made false statements to the Plaintiffs, the general public, news media and government agencies that exercise regulatory authority over Johnson & Johnson, including the U.S. Food & Drug Administration ("FDA"), the Occupational Safety and Health Administration ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused Plaintiff's harm through intentional efforts to deceive the general public as to the safety of and presence of carcinogens, including asbestos, in talc-containing products.

29.     Johnson & Johnson, since the early 1900s, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including asbestos, in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

30.     Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth.  It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics.  In its loose form and as used in Johnson & Johnson's products, talc is known as "talcum powder."

9

31.     Geologists, Johnson & Johnson, and CTFA – and their suppliers, experts, agents and advisors – have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos.  Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite.  The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

32.     Johnson & Johnson, one of the largest talc producers and/or talc-containing product manufacturers in the world, admits that it has long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that it has long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos, in talc and talc deposits.

33.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic.  Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

34.     Johnson & Johnson and its affiliates, employees, agents and/or suppliers were members of the National Safety Council.  In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study

10

conducted among tremolite, talc and slate workers.  The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated: "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."  As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."  In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content."  The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and Carborundum dusts" had "claims prosecuted successful."  The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

35.      In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" stating that "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material offers another type of dust which may cause fatalities among workers."  In 1958, the New York Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

36.      In 1968, a study presented at 'the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that 141 of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous

11

material was predominantly talc but, contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968).

37.     A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc... We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post.

38.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products.  Johnson & Johnson and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Johnson & Johnsons' products.

39.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained

12

various, fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

40.     In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

41.     Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital—then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Johnson & Johnson and CTFA, citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos and other carcinogens.

13

42.     After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

43.     Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be asbestos-free. These were some of the same grades of talc used by Johnson & Johnson.

44.     The talc industry's response, including that of Johnson & Johnson, was swift and well-coordinated through CTFA, an exclusive lobbying and advocacy group representing the cosmetics industry that conspired and worked in concert with the Johnson & Johnson to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including Johnson & Johnson's products.

45.     Regarding the FDA's proposed 1972 ruling-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly

14

objected to the FDA alerting the general public and publishing the brand names of the talcum

powders, as it would cause the manufactures "economic hardship." Dr. Merritt also threatened to

sue the FDA to prevent the disclosure of the brand names. Unsurprisingly, the FDA, Johnson &

Johnson and CTFA never revealed or publicized the brand names of the talcum powders that

contained asbestos, much to the detriment of the Plaintiffs and the general public.

46.     In 1973, CTFA created a talc subcommittee and the Scientific Advisory

Committee to develop a testing methodology for detecting asbestos in talc. Initially, CTFA

designated a group of its Members to tests talc grades used in talcum powder utilizing the

methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in

commercially available talcum powders, plus one talc sample purposely spiked with tremolite

and chrysotile, were circulated among the members, including representatives of Johnson &

Johnson. Of the eight participating members, four found asbestos in every sample, three did not

find asbestos in any sample (including the spiked sample), and one found asbestos only in the

spiked sample. In conclusion, all members agreed that the best and most reliable method of

detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The

same members, however, dispensed with this analytical method, claiming TEM and electron

diffraction equipment was too expensive, despite Johnson & Johnson then owning or having

unfettered access to same.

47.     From there, the difference between what Johnson & Johnson and CTFA knew

diverged from what they were representing to the FDA. Johnson & Johnson, CTFA and others in

the industry knew that there was no such thing as asbestos-free talc—only talc in which, asbestos

could not be detected using the prevailing, most economic analytical methodology, XRD, which

at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

48.     Johnson & Johnson and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially; only four or so grains per 20 tons of pre-shipment and pre-processed talc were being tested. Johnson & Johnson and CTFA also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent Johnson & Johnson found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

49.     Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA and Johnson & Johnson were slow to address the issue of asbestos in talc and talcum powders. Johnson & Johnson had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

50.     Taking matters into their own hands, Mt. Sinai. Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of Johnson & Johnson's

talcum powders that were tested contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc... We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were published the same year by the *New York Times* and the *Washington Post*.

51.     Johnson & Johnson and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

52.     CTFA finally began in earnest to produce a voluntary protocol and methodology that would provide Johnson & Johnson cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, Johnson & Johnson and CTFA falsely represented that talcum powders have never contained asbestos.

53.     Johnson & Johnson and third parties collectively met with and corresponded with CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Johnson & Johnson's "voluntary" method—that was developed collectively by Johnson & Johnson and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Johnson &

17

Johnson and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which WILLIAM KAUFMAN was exposed.

54.     In support of their voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including Johnson & Johnson, identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, Johnson & Johnson and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

55.     Johnson & Johnson and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Johnson & Johnson intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiffs, that talc-containing products contained asbestos.

56.     CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

18

57.     CTFA and Johnson & Johnson have represented to various news media outlets

and the public at large that their products are "asbestos-free," when, in fact, their products did

test positive for asbestos and those that did not were merely the result of inadequate and

imprecise testing methods. "No asbestos detected" means something much different than "no

asbestos," but due to Johnson & Johnson's repeated conflation of the terms, the public has been

lead to erroneously believe talc products are safe. Furthermore, since Johnson & Johnson and

CTFA did not have sufficient testing protocols in place to support the claims that talc products

were safe or asbestos-free, such statements were recklessly made, as they had no reason to

believe them.

58.     Between 1970 and the 1990s, tests conducted by and on behalf of Johnson &

Johnson and the talc industry continued to show that talc and talcum powder products contained

asbestos. None of these positive tests have ever been produced or made known to any regulatory

agency, and knowledge of their existence is only because of civil litigation.

59.     Johnson & Johnson's and CTFA's failure to disclose these positive results and the

inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when

various government agencies raised concerns about the safety of talc, including the issue of

asbestos content.

60.     To this day, many talc-containing products presently on the market contain

asbestos. Instead of publicizing this fact, Johnson & Johnson and CTFA continue to deny all the

above to protect their pecuniary interests, to the severe detriment of the public in the United

States and worldwide, including Plaintiffs.

61.     Since at least 1979, Johnson & Johnson have conducted a campaign to convince

the public that their products are regulated by the FDA, that their tests are conducted pursuant to

FDA regulations, and that talcum powder products are therefore safe. Nothing could be further from the truth; the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Testing for the safety of Johnson & Johnson's products has always been voluntary under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos- containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

62.    Johnson & Johnson, (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in both their finished products as well as talc shipments from Johnson & Johnson and other sources that were used to produce finished products.

63.    Johnson & Johnson, and even the outside laboratory McCrone Associates, sent letters to CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made. Johnson & Johnson made and published such representations claiming that their testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary. Johnson & Johnson intentionally and knowingly did so to avoid FDA regulations that may have required Johnson & Johnson to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiffs, that talcum powder products contained carcinogens, including asbestos, and were therefore dangerous.

20

64.     After 1976, Johnson & Johnson and the CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in talc.

65.     Johnson & Johnson failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained carcinogens, including asbestos, at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain such carcinogens.

66.     Johnson & Johnson and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiffs, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

67.     Johnson & Johnson conspired and/or acted in concert with each other, and/or with other entities through agreement and consciously parallel behavior:

a.      to withhold from users of their products—and from persons who Johnson & Johnson knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

b.      to eliminate or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

c.      to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

21

d.      to falsely represent that talc and talcum powder products, including those of Johnson & Johnson, were safe for use by consumers.

68.      WILLIAM KAUFMAN reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Johnson & Johnson and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

69.      CTFA was founded in 1894 as the Manufacturing Perfumers' Association ("MPA"). MPA was established to coordinate industry opposition to legislation that would increase the tariff on imported raw materials, affecting the cost of producing toilet goods. In 1922, MPA changed its name to American Manufacturers of Toilet Articles. ("AMTA"), extending its membership eligibility to companies beyond perfumers. By 1924, AMTA membership included 115 active members and 105 associate members, including Johnson & Johnson. In 1970, AMTA changed its name to CTFA. In 2007, CTFA changed its name to PCPC. Johnson & Johnson was a member of or otherwise contributed resources and/or financial support to the AMTA, CTFA and/or PCPC. PCPC' s more than 600-member companies manufacture, distribute, and supply "the vast majority of personal care products marketed in the United States."

70.      As indicated above, "asbestos" has become a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. XRD determines the crystalline structure of minerals by measuring the diffraction angles of an X-ray beam that has

22

passed through the mineral. While XRD can identify amphibole minerals, it cannot determine if the mineral identified is fibrous or not, and thus it alone is not reliable for asbestos identification. TEM is the most sensitive and reliable instrument for detection and identification of all asbestos types in all size ranges. Finally, an energy-dispersive X-ray detector ("EDX") interfaced with a TEM yields elemental composition, confirming the asbestos fiber's identity. Only TEM can detect and identify the very thin asbestos fibers that are the greatest health hazard. As such, it is the necessary final step to confirm an absence of asbestos contamination. By the 1970's, TEM was already established as a reliable method for asbestos identification. McCrone Associates, the laboratory selected by several talc producers—including Johnson & Johnson—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

71.     Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one or both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by

23

FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained 1% chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial tales reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

72.    A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFA for evaluation of analytical  methods as well as the several identifications of asbestos in talc mentioned.

73.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including Johnson & Johnson, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Johnson & Johnson's products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray, diffraction or differential thermal analysis

24

are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March 15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of CTFA responded that "the subcommittee would give serious consideration to this suggestion."

74.     CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." CTFA met with and corresponded with Johnson & Johnson and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA, Johnson & Johnson and others, and was advocated to the FDA by Johnson & Johnson in lieu of regulations requiring labeling and warnings on talcum powder products, even though Johnson & Johnson knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while

25

using the CTFA's own J4-1 method. There is no evidence that Johnson & Johnson ever shared this remarkable failure with the FDA or the public.

75.    Minutes of CTFA's Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators..." When referring to the challenge of chrysotile detection, an article entitled "Talc" in the January/March 1976 CTFA Cosmetic Journal, states that, "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos...it was asked, 'Why should we test for chrysotile if there isn't any?'" CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after, 1976, CTFA and Johnson & Johnson continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CFTA continued to represent that no asbestos was detected in cosmetic talc. This material representation adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free."

76.    The FDA, and ultimately WILLIAM KAUFMAN, directly and/or indirectly relied upon CTFA's false representations regarding the safety of cosmetic talc. In fact, an FDA letter dated January 11, 1979, states, "In cooperation with scientists from industry, our scientists have been

making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and Johnson & Johnson's misrepresentations was obvious seven years later. In a July 11, 1986 response to a citizen petition to require an asbestos warning label on cosmetic talc, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole..." CTFA's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

77.     Johnson & Johnson controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiffs, regarding the hazards of exposure to carcinogens, including asbestos, from talc and talc-containing products.

78.     Johnson & Johnson intentionally failed to warn potential users, including WILLIAM KAUFMAN, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos in their talc and talc-containing products.

79.     Johnson & Johnson knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which WILLIAM KAUFMAN was exposed.

27

80.     Johnson & Johnson, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including Johnson & Johnson's products to which WILLIAM KAUFMAN was exposed.

81.     Johnson & Johnson, both acting individually and in concert with others, violated the common law duty of care owed to Plaintiffs or otherwise engaged in intentionally culpable activity that caused Plaintiffs to suffer severe injuries and damages.

82.     The actions and inactions of Johnson & Johnson constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiffs as described in this complaint.

83.     By reason of the foregoing, Johnson & Johnson is liable to Plaintiffs for the injuries and damages sustained by virtue of its fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

WHEREFORE, Plaintiffs have been damaged and claims damages of the defendants, jointly and severally, in an amount in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania.

**JURY TRIAL DEMANDED AS TO ALL COUNTS.**

Respectfully submitted,

GOLDBERG, PERSKY & WHITE, P.C.

By_____

Leif J. Ocheltree, Esquire
PA ID No. 163508
Attorney for Plaintiffs

28

## VERIFICATION

I, WILLIAM KAUFMAN, hereby certify that the statements set forth in the foregoing COMPLAINT IN CIVIL ACTION are true and correct to the best of my knowledge, information and belief. The factual matters set forth therein are based upon information which has been furnished to my counsel, or which has been gathered by my counsel as it pertains to this lawsuit; that the language contained in the foregoing is that of counsel and not the undersigned; and, that to the extent that the contents of same is that of counsel the undersigned has relied upon counsel in making this verification.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn fabrication to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Date: 3/21/19

William Kaufman

## VERIFICATION

I, IRENE HARDING JESTER, hereby certify that the statements set forth in the foregoing COMPLAINT IN CIVIL ACTION are true and correct to the best of my knowledge, information and belief. The factual matters set forth therein are based upon information which has been furnished to my counsel, or which has been gathered by my counsel as it pertains to this lawsuit; that the language contained in the foregoing is that of counsel and not the undersigned; and, that to the extent that the contents of same is that of counsel the undersigned has relied upon counsel in making this verification.

I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn fabrication to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Date: 3-28-19

Irene Harding Jester

**Jessica Nelson**

| | |
|---|---|
| **From:** | webmaster.pro@county.allegheny.pa.us |
| **Sent:** | Wednesday, April 17, 2019 11:59 AM |
| **To:** | Jessica Nelson |
| **Cc:** | promail@county.allegheny.pa.us |
| **Subject:** | Initial filing approved confirmation -  Case ID: TMP919522 |

# Approval Details

*Please be advised that dockets have been accepted by the*
*Allegheny County Department of Court Records, Civil/Family Division for Case Number:GD-19-005732*
*Dockets filed for Temporary Case Number: TMP919522*
*have been assigned to Permanent Case number:GD-19-005732*

| | |
|---|---|
| **Temporary Case Number:** | TMP919522 |
| **Permanent Case Number:** | GD-19-005732 |
| **Description:** | Kaufman etal vs Johnson & Johnson Consumer etal |
| **Status:** | success |

## *Docket Details are as follows:*

| Case ID | Docket Type | Sequence nbr | Amount | ClientID | CompanyID | Date/Time |
|---|---|---|---|---|---|---|
| GD-19-005732 | COMPL | 1 | 182.75 | K2120-01-01 | | 4/17/2019 10:07:09 AM |

*(There will be an additional 4% service charge on all Credit Card e-filings by the merchant card provider)*

*Thank you for using the DCR, Civil/Family Division Electronic Filing and Retrieval System.*

**Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or**

1

**distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.**



FIRST-CLASS MAIL
\$008.20

7018 1830 0001 3639 0217

ERSKYWHITE P.C.
Y'S   A T   L A W
0: PITTSBURGH, PA 15222-1312

JOHNSON & JOHNSON CONSUMER, INC.
One Johnson & Johnson Plaza
New Brunswick, NJ 08933